United States v. State of Mississippi. And we'll hear from Mr. Stewart. Mr. Stewart, we were aware of you having argued in some other courts. Is this your first appearance in the Fifth Circuit? I did have the honor of appearing last year before the Fifth Circuit in this role, Your Honor. It was remote at the time. In previous roles, I've had the opportunity, but I'm very honored to be here. As solicitor general, I meant the first time. Thank you, Your Honor. Appreciate it. May it please the Court. I'm Scott Stewart on behalf of the State of Mississippi. Title II of the Americans with Disabilities Act is an important statute. And like many important statutes, Title II is fraught with risk of overreach and misuse by the United States government. Nowhere has the United States done more to overreach and misuse Title II than in this case. That overreach led the District Court to condemn and take control of Mississippi's mental health system. The judgment below rests on serious errors of law. And this morning, I'd like to do my best to focus on two of them. Just briefly before I do that, however, I want to emphasize that this appeal presents this Court with a rare opportunity. It's very rare for a case like this one, a Title II case brought by the federal government against the state, to reach an appellate court. The pressure to settle such cases is enormous, and most states won't risk the fight. As a result, the United States has almost never called to account for its overreaching misuse of Title II. Today, the state of Mississippi asks this Court to hold the United States to account and require it to follow the law. As I said, I'd like to address two issues. Each of them provide a clean path for rejecting the judgment below. Counsel, before you leave your opening context, I'll ask the United States this as well. My understanding is most of the litigation the United States is involved in under Title II is for individual people who are seeking these services, who may have gone through an administrative process first, and then the Attorney General is suing on their behalf. You said usually these things don't make it to appellate court, so is that the kind of litigation you're talking about? I think it's not suing on behalf of the allegedly injured person, Judge Southwick. I think the United States says we're suing to enforce the rights. I'm not talking about this case. I'm talking about the cases that you say generally don't reach the appellate level, and I thought from some of the case law that's been presented to us that that's how the United States government in the past has generally been involved is on behalf of individual people who are seeking these services who have gone through some sort of administrative process claiming that the state is not providing those services. I think it's—we don't have a ton to go on because there are a lot of, I think, consent decrees in this case or in these sorts of cases, Your Honor, but I think, Judge Southwick, the United States tends to be careful not to say we are suing on behalf of this individual person. It ends up suing to kind of go after a system-wide claim to vindicate those rights, but it's a broader claim. Well, I have to confess, I meant to send a letter out to counsel and ask you both to opine about— basically about the dispute that occurred in the 11th Circuit in a case against Florida on this same basis and whether Title II affords a cause of action to the United States at all. Did Mississippi take a position about that in the district court? We did. We did get that letter directed, Your Honor. Okay. Yes. So our position, and the district court rejected it on summary judgment, was similar to Florida's position that the federal government does not have a cause of action in this case. Again, the district court rejected that. We think the argument is intuitive, straightforward. The remedies provided under Title II are to persons. The United States is not a person. This has to be brought in by a person as homestead attorney. So you're saying it was preserved in the district court but not in the appellate briefing? We did not raise it in the appellate briefing, Your Honor. I don't think it's waivable, however, in this instance, Judge Ho. And the reason for that is that it does go in this instance to Article III standing. The United States in this case— cause of action in Article III standing, typically distinct, sure. But here, the United States is not an injured party under the ADA. It doesn't have injury, in fact, but for what could be given to it by statute. The way I'd analogize it, Your Honor, is, I mean, think about somebody who is subjected to excessive force by a state officer. This idea of Congress can create statutory cause of action. That's right, Your Honor. TransUnion, Smokio, that sort of whole debate. That's the idea, Your Honor, that both under Title II and CRIPA, the United States—they're not an institutionalized person. They don't have serious mental illness. They're not bringing suit on behalf of an individual, so they need some— No standing unless Congress gives it to them, and your point is Title II conspicuously doesn't. Exactly so, Your Honor. I mean, I think the Supreme Court said as to CRIPA itself, I mean, I believe the line in Patsey v. Board of Regents was CRIPA was enacted in significant part to give or, you know, in some measure to give the United States standing to sue for conditions cases. So that's kind of the short pitch on that. I do also think that the Court has, you know, has the option in this to reach the issue. It has in the past reached issues of kind of cause of action kind of things. A case, you know, on that front is—it's often cited and was cited and used to this extent as recently as last year was National Solid Waste Management. This is 389 F. 3rd, 491. And as recently in a matter of dean last year, 18 F. 4th, 842. The Court has recognized that. And that's in—I can give pin sites as well. But the dean matter, Your Honor, I believe it was an opinion by Judge Weiner. It's 844. It notes 4 to 5 in the dean case and 497 to 499 and some other pages in the National Solid Waste Management case. And here there are very good reasons to reach it. I mean, very similar to our opening at serious risk of institutionalization argument, Your Honor, this really goes to the heart of whether this is a proper suit at all. Can the United States bring this kind of system-wide claim not tethered to any particular individual, not tethered to actual institutionalization? And so pure legal and the Court can reach it. And I think the arguments are well set forth by Judge Newsom and Judge Branch in that case. Would we be, obviously, creating a circuit split by doing this? Yes, Your Honor. Nobody else is—we'd be creating a circuit split, not just expanding one. No circuit's done this. Right, Your Honor. That's fair. I mean, I think, you know, Florida was up front about this in its cert petition that was denied the other day. It would create a circuit split. I do think this is one of those cases where that is warranted, Your Honor. It really just is that important. And I think, you know, the answer is—I think it goes on for a good number of pages in those opinions, of course, but I think the answer here is quite clean and clear that the United States is not a person. I would emphasize that—I mean, Judge Boggs' opinion in the Eleventh Circuit case had its own table of contents, so I think you have to do a lot of muscling to kind of, you know, say that the United States can bring a cause of action here. So I would say you have a pretty clean clip there. As to CRIPA, Your Honor, one thing I'd emphasize is that CRIPA is about egregious or flagrant conditions. That's not what the claim is here. I mean, part of the claim is it's basically the opposite. It's that, you know, people get the treatment they need in hospitals, but they don't get it elsewhere. So either way, I think the Court can reach it. On the serious risk— Would you make of the fact that there are quite a few very distinguished, respected judges who obviously did not go along with this? Newsom was fairly lonely in his dissent. He had a friend, Judge Branch, Your Honor. He had one friend. Sometimes that could be how it goes in these things, but, you know, it's— I think the arguments are well in line with the careful— I think the return mail case, a 6-3 decision from the Supreme Court not long ago, applying this kind of longstanding presumption that the person doesn't include the sovereign. So, you know, often lonely situations for courts of appeals judge can be very friendly situations at the Supreme Court. If I can make a few points on this other threshold kind of fundamental issue about serious risk of institutionalization, I think, you know, textually in both the statute and the regulation, this is just an untenable approach, the idea that the risk of institutionalization is enough. And it also leads to some very, very strange, illogical, problematic consequences, and it really shows what I got to—or I mentioned earlier that the United States has really overreached in this case. Title II prohibits discrimination, and discrimination means unjustified segregation in an institution. I mean, it almost hammered this. It said it half a dozen different ways. Unjustified isolation, undue institutionalization, unjustified segregation, unjustified institutionalized isolation, confinement in an institution, on and on. And that makes sense. You know, if discrimination means putting somebody in an institution when they could benefit in a community setting, and someone's living in a community now, that's not discrimination. And the risk or possibility of institutionalization someday in the future possibly, you know, doesn't change that. The statute just doesn't make a violation to be the risk of discrimination. It makes discrimination—again, this is a very broad statute. Congress was not shy. I think the way they're treating it, and I believe the way the district judge understood it, was that the people who have some sort of serious disability are cycling in and out. So they may not—they are, quote, at risk because every time they fall off the wagon, they're going to the hospital, and then they come back again. And the treatment is insufficient at the community level, and therefore they go back to the hospital. So what—is that a viable claim? It's not, Your Honor. I think it also runs afoul—I think actually the integration mandate, the text of the regulation actually makes this pretty squarely, too. What the integration mandate regulation, the attorney general's own regulation, it calls for placing somebody being in the most integrated setting. Like setting—that's a location. It's where you are now, and it's not where you might be in four years. So when somebody's in the community now, the regulation is satisfied. And I think if I could just draw out just briefly some of the very odd logical implications of this at-risk theory. I mean, on the United States' view, if someone with serious mental illness is living in the community now but is at risk of someday ending up in an institution, that means the state is violating Title II today. And the Wasco case, Judge Radler in a partial concurrence, partial dissent pointed this out, and he said, look, you know, this case shows the problems. You know, the plaintiffs there filed suit claiming they were at risk of institutionalization. The opinion at issue there came out four years into the litigation, and they still had not been institutionalized. On the United States' view, even though they hadn't been institutionalized in 40 years, there was a violation at the beginning of the suit and even before. Another issue that really is drawn out with the population of folks with serious mental illness is just how boundless it is and how we can really take from a logical standpoint that Congress really didn't adopt this is that people with serious mental illness are unfortunately— they're virtually by definition always at risk of institutionalization. That's the nature of this very, very challenging illness. It's cyclical. The United States conceded and its experts acknowledged, look, institutionalization is sometimes needed to stabilize folks with serious mental illness. And under the United States' view, basically, by definition, if you have anyone in your state with serious mental illness, you are violating Title II today. I mean, that just cannot be what Congress said, and it's not what it said. And this gets to kind of the last point I want to drive home on just the logic here, is that at risk, at serious risk, these don't have objective meaning. The statute, Title II, it doesn't address, adopt, or define at risk. There's no objective way to determine it. As Judge Radler again said, look, whether somebody's in fact institutionalized, that's a bright-line determination. Judges can tell what that is, and judges can apply that. But here, there's just no objective basis. No one knows what it is. Some of the United States' experts said things like at risk is the same thing as serious— at serious risk, they seem to equate. If it's just a matter of time that somebody's at risk. Is there any connection drawn in the evidence between the deficit of community facilities and people who were demonstrably at risk? I think, you know, the experts, I think, tried to show that for a small sample of folks, Judge Jones. I think I have to quibble with the possibility of showing kind of a demonstrably at risk, because it's just not objective, and there's just no way to administer it. It's not embodied in the statute. So I think just as a matter of law, it doesn't work, and really cannot be shown on an objective way that's tethered either to Title II or to the integration mandate regulation. Well, so let me ask you to assume two things. One is that the United States does have the right under Title II to bring an action challenging a system. And secondly, that there is evidence that the system is institutionalizing, hospitalizing the four mental health hospitals in Mississippi, a very high percentage of people, and that regional community centers are being underutilized. How can that claim be made? The United States has the right to sue under Title II. The facts are as I just identified. What could the United States do in your understanding of Title II? So, you know, assuming those points, Your Honor, I think it's still very hard. You certainly would need more than just a sample of folks. You would need what Olmstead calls for. Is it an evidence problem, or is it who they're suing on behalf of? Do they need to find 100 people to sue on behalf of? I think, I mean, that's one possible way to do it. Here might be a way to look at it, Your Honor. I mean, I think under this statutory regime and folks with serious mental illness, it's very hard to bring a mass claim. I mean, imagine 100 folks who might have very good Title II claims individually. There's nothing that entitles them to bring that claim as a single class action. They have to surmount the requirements of Rule 23. I mean, and that's hard. It's not assumed. It's demanded. And here the United States is basically skipping past all of that, skipping past all the burdens of having to be tethered to the actual circumstances of a particular human being, a living, breathing person who has these challenges of serious mental illness and basically gets all the benefits of a class action case, all the benefits of a systemic case without all the burdens, the things they have to surmount. So I think that's really the problem. One thing, just as I see I'm running out of time, I'll emphasize. There's an argument that people in this category have particular difficulty defending their rights. I take it your point is that's for Congress to decide. It is, Your Honor. But I also, you know, I mean, Olmstead was itself brought by individuals a good number of times. It's not impossible, but many, you'll surely recognize many people in this category are going to have difficulty even if the individuals in Olmstead did not. I think, Your Honor, the amount of case law endorsing or addressing the at-risk theory does suggest that there are not huge barriers to bringing these claims, even when institutionalized. I see I'm at time and all. Thank you, Court. What was the second point you were going to be making? Just wondering. My first point was the serious risk, Your Honor. The second point was the cause of action standing. I see. Okay. Thank you. Ms. Baldwin? According to the government, is there any state in the United States that would satisfy the standards of the district court's injunctive order and monitoring here? Your Honor, the district . . . Yes or no? Surely. I mean, the district court's standards on the remedy here are based on the programs that the state of Mississippi has itself decided to offer. I understand that. I'm just wondering whether . . . I know the DOJ has sued Florida and Georgia, probably sued Alabama because it's right next door to Mississippi. When are you going to sue Texas? Your Honor, the evidence in this case is based on, again, what Judge South was talking about. The ADA sets up an administrative complaint process. The United States has clear statutory authority to enforce Title II of the ADA. Under thirty years of precedent, no court . . . There's the one district court in the Florida litigation that it held there was no cause of action. That was, as the court is aware, overturned by the Eleventh Circuit. Rehearing on Bonk was denied, and the Supreme Court denied cert, and that is well taken. It's well established that the United States has the authority to enforce Title II. So the statute, the way that it works, Section 12 . . . You say it's well established. I mean, you've got Congress . . . I assume you agree Congress gave an express cause of action for the United States in Title I and in Title III, but for whatever reason not in Title II. So in Title II, based on the way the statute was designed, Title II simply took the established remedial scheme under the Rehab Act and said the rights, remedies, and procedures for any person alleging discrimination . . . And to be clear, we don't allege that the United States is a person alleging discrimination. It said the bundle of rights, remedies, and procedures that a person has are the same as under the Rehab Act and the same as under Title VI. Surely you'll acknowledge Congress, for whatever reason, drafted II differently from I and III. I mean, Congress could have done the same thing in those other provisions, and I think your argument would be much stronger. It's not expressed, but it's incorporated by reference, yada, yada. Here, it seems like a deliberate choice, isn't it? Absolutely, it was a deliberate choice, and it's a choice that makes sense because Title I of the ADA is an employment statute, and so it is simply extending the protections of Title VII. And in Title VII, you have enforcement authority split between the attorney general and the EEOC. So there was a need to specifically reference a language that very much parallels the Title VII enforcement language, the attorney general there. Title III is a new enforcement statute. There isn't a parallel. But Title II, what Congress was doing was just using the tried-and-true language that Congress had already used for the Rehabilitation Act and for Title VI. And under this court's own precedence, this court has held that the attorney general in Marion County, United States v. Marion County, and in United States v. Baylor Medical Center, and I can get the citations for those, those are cases that hold that the United States has a cause of action under Title VI and under the Rehabilitation Act. And the statutes incorporate the same scheme. There's no reason to treat that as— You're saying we'd have to blow up everything to— Yes, it would blow up everything. And, you know, the fact— No, it wouldn't blow up everything. It would just say that the United States can't sue in regard to programs and services of state governments under Title II. That doesn't blow up everything. The United States has specific authority to offer regulations, does it not? And if the—which it could do for Mississippi or any state and has done, and if those are not complied with, no tiki, no laundry, no money from the federal government, right? Absolutely. And Judge Jones, you make an excellent point that the United States could have also brought this suit under the Rehabilitation Act. Again, under the court's clear precedent, it would be the same result. But there was no need to because the understanding is the United States, it's the same statutory language in the Rehab Act and in Title VI. No, the Rehabilitation Act does not define the United States as any person, does it? The Rehabilitation Act says— Yes or no, does it? No, in the United States— That's my point. But this court's precedent has said— We treat language seriously in the law. Yes, Your Honor. And in this court's precedent, this court has held that the same language, the rights, remedies, and procedures that are available to any person under the Rehabilitation Act and Title VI, that bundle of rights, remedies, and procedures includes the ability to file an administrative complaint that is then investigated. And if it's not sufficiently resolved, it includes federal court action. And so that's— By the U.S. By the United States. And so, again, I just want to make clear, this issue, you know, there's— I think your point is, essentially, even if you have a problem as a textual matter, that's for our en banc court. That's sort of weird to say the same text that allows for U.S. cause of action over there somehow does not allow for cause of action over here. Absolutely. And more fundamentally— Should we take the en banc? Those—more fundamentally— You don't need to answer that. Those decisions were uniform throughout the federal courts and not just this court. When Congress passed the ADA in 1990, and so it was ratifying— Congress ratified the understanding of this court in those decisions. Counsel, let me ask you three questions. I identify that now because my colleagues may not let me get all three asked out if I don't identify it now. First, when would you say we would— that looks at all like this one? So, the United States has, you know, been in the New Hampshire of the United States. Now, what I want to make sure you're answering is a suit that brought against the state for its mental health system and not representing a few people or however many people it may have been who have come through the administrative process and then the attorney general is suing after that process is over. So, that's the same—those are one and the same. No, let me ask you. That's not how this case got started, is it? Yes, Your Honor. This case began as is reflected in the 2011, you know, letter—conciliation letter to the governor of Mississippi that there had been an administrative complaint and then the United States undertook a period of time to try and work cooperatively with the state to bring the state into compliance and when that failed after years of effort, the suit was filed. Well, but when you're bringing a suit in that general context, aren't you suing not the whole system but you're suing to vindicate whatever the omission was by the state for those individuals? No, Your Honor. Much like the EEOC brings cases to, you know, vindicate in its own name and it's certainly vindicating the rights of individuals but it's not tied to those specific interests. It's always tied to an individual unless it's a pattern or practice case. Well, Your Honor— It's always based on the fact that some individual has complained about discrimination and instead of issuing a right to sue letter, the EEOC says, wow, we think this is significant, we'll check into this and then they have a group of individuals for whom they are seeking relief. Your Honor, I mean, this is a pattern or practice case. I would note that, you know, in addition to Title II, the United States is also asserting a claim under CRIPA and the state— There was no effort made to establish the evidentiary basis for CRIPA.  And because that specifically is limited to egregious violations of mental health treatment. Well, Your Honor, the reason why there's not more factual development and again CRIPA has very stringent procedural requirements and certification by the Attorney General in signing the complaint that we're all facially met is that the state simply admitted in paragraph 19 of its answer that suit was appropriate under CRIPA. So the further, you know, factual predicates, they're certainly present in the record. You have the state's own at one of the state hospitals' directors saying that approximately— medical director approximately half of the people who are institutionalized at the South Mississippi State Hospital don't need to be hospitalized. You have the expert testimony from Dr. Drake saying that the length of hospitalization is never appropriate. So those factual—the factual predicates are certainly in the record. They just weren't raised by the state. And I just want to add as a grace note that, you know, this issue, I disagree that it's jurisdictional. It doesn't raise an issue of Article III standing. It's black letter law and steel code, Lexmark, and a host of cases that the existence of a valid cause of action doesn't go to subject matter jurisdiction. You know, this court's en banc decision in Green Valley at 969 F. 3rd 474 talks similarly about whether a plaintiff, you know, whether a municipality was appropriate to bring a 1983 cause of action and says that that's certainly an issue that can be waived and forfeited here, and it was. I mean, the state— No, but it's a different thing when you're talking about an act of Congress. So we can agree to disagree on that. Let me ask my second question, if I might. One is, and it is, how often has Justice Department used the kind of sampling evidence to challenge a system, a statewide system, as was done in this case? This has also been used in litigation in New Hampshire, and I want to— It's the second time you mentioned New Hampshire. Is that the one other example? No, Your Honor. I mean, we've also brought— I'm just aware that it had a similar, you know, expert reports, but frequently, you know, cases are settled before they reach the stage of litigation. That's true, but I want to make clear that this isn't the case, that this is just an at-risk theory, and that— Well, please, stick to my question right now. I mean, one of the significant problems here, it seems to me, is whether you can sue in this sort of general way for the whole population that may be subject to the need, very important need, for mental health services in Mississippi and do it through sampling, and so that was my second question. You seem to say it's at least been done before. I don't know if you can allow me to get to the bottom of just how often it's used. Let me ask the third question. How often has a monitor been named as a result of Title II litigation for a state mental health system? That is a frequent practice in court orders, you know, that are frequently reached by consent. That is not unusual in the United States enforcement of Title II. How about in litigation? I'd have to— How about being ordered by a court as opposed to being a consent decree, ordered over the objection? In adversarial litigation, I don't have another example. I'm not saying there isn't one, but to know off the top of my head, I don't want to— Well, you can file a 28-J letter to inform us about the answers to Judge Southwick's questions, which I don't think have been really forthrightly answered, maybe because you don't know. I'm glad to do so, Your Honor. In talking about the at-risk theory, I want to make clear to Judge Southwick that the United States case is based on both the clinical review, which provided excellent evidence of the fact that community-based services aren't being provided, that Mississippians with serious mental illness aren't receiving care in the most integrated setting appropriate to their needs, as well as the undisputed factual findings about the actual unavailability of the services on a statewide basis. This is the question I had. Was there any effort to tie the unavailability of services around the state to specific patients? I think as an absolute causal matter, there's not saying— Well, in other words, if all 154, I think it was, interviews were conducted of mental health patients in the Jackson, Mississippi area and surroundings, then that has nothing to do with the unavailability of services in other counties, right? Absolutely, Your Honor. And part of the clinical review was meant to be a representative, generalizable sample, and it was structured so that both by diagnosis, by length of stay, by demographics, that it would be fully representative to the population of people who are institutionalized over a two-year period, the 3,951 people. And so that was done by a biostatistics professor from Dartmouth, Dr. McKenzie. There was no Daubert challenge to the representativeness of his sample, and he testified at trial that the results in saying that all 154 people in the clinical review sample could have avoided or shortened their institutionalization if they had been provided with reasonable community-based services, but none received services in sufficient intensity to do that. He testified at trial that that was generalizable to the entire population that was institutionalized based on the fact that it was a weighted stratified sample. So Your Honor is correct. The sample wasn't just drawn from one geographic region. It was meant to be representative. But I don't understand. Some of the patients were institutionalized at the time, but most of them were not. Isn't that correct? Yes, that is correct. All of them had been previously institutionalized. Well, so what? I mean, the fact that someone is institutionalized in the past doesn't prove anything about the insufficiency of services at the time of trial. Well, what it proved in this case, Your Honor, is because the United States experts interviewed these individuals where they were available. They looked at their medical records. They talked to community providers, and they looked, and they saw that as to these individuals, they hadn't been receiving community-based services before or after. All right. We'll have to look closely at the record because there's a serious dispute between the parties about what the record shows. So in this case, Your Honor, the state's experts testified that at the time people were institutionalized, they were appropriate for care. The United States case is not based on disagreeing. Well, there might have been, yeah, but if there were ten people who were institutionalized and the experts, only two of whom were doctors, I'm not quite sure what the qualifications of the others were, and they said, well, you shouldn't be in here, and the sick person said, oh, yeah, you're right, I shouldn't be, that only goes to ten people. That doesn't go to the population of several thousand, does it? Your Honor, what the experts testified is, have these people, did they receive reasonable community-based services before or after their institutionalization that would have made a difference? And they found that for all 154 of them, none of them had received community-based services in sufficient intensity, and most had received no community-based services at all. So that's the causal link, Judge Jones, where you have, you know, someone like person number 133, who's institutionalized 16 times and never received community-based services, person number 58, five times over a two-year span and received no community-based services between institutionalizations. So that risk, that they remain at risk of future institutionalization, it's not a speculative future harm, it's just because the United States isn't suing in a representative capacity for these exact individuals, it's saying the harm has occurred, the actual institutionalization has occurred, and it will continue to occur, absent the state making services actually available. How long were these institutionalizations? So, again, some of them were, you know, a period of weeks, months, and some of them lasted years. Currently, some of the people in the clinical review sample remain partly institutionalized. They've been institutionalized 16 times for years, so obviously that wasn't one of the individuals you're talking about. The 16 institutionalizations weren't all during that two-year period. I'm sure they weren't. That's correct, Your Honor, but half of the people who we looked at in that two-year period, approximately half of them had been institutionalized previously. Let me ask about what Judge Southwick, a little more about what Judge Southwick was talking about, because by the time the district court entered its remedial order and then appointed a monitor, the state had, in fact, expanded community services to all of its counties, right? At a great, apparently significant cost. And the state says that it undertook to correct all the deficiencies that the government had argued about in the case. That being the case, how did the court have authority to issue an ongoing injunction? So the injunction ensures that there will be compliance over time. But that's not the way courts work. If the court found that they had done exactly what the court had criticized the state for not doing, then it issues a judgment that says no further relief is necessary. The question of relief is moot, but someone can file suit if there are deficiencies in the future, or you could issue an injunction that said the state has to, you know, fulfill its obligations, and if it doesn't, it will be held in contempt. You don't say, oh, yeah, I've thought of eight or nine more things you need to do, and oh, by the way, you're going to pay for a monitor forever with no limit whatsoever on what he says, transferring your Article III authority to the monitor to make an ongoing, you know, to be the ongoing person in charge of the whole system. That's an improper extension of Article III authority, isn't it? Your Honor, I disagree based on, and the district court appropriately found based on the record in this case, that what we had after trial, there was a two-year period where the parties attempted to negotiate, you know, agreement to come into compliance, and then at the time of the remedial proceeding, the state submitted a three-page declaration years after discovery had closed that said we've done these things. But the district court's central factual finding is that on paper, Mississippi has long had on paper the programs that are appropriate and necessary to reduce institutionalization, but they weren't being made actually available in practice. And so the remedial order, the monitor, it lasts for a period of one year to meet compliance as to each of the specific paragraphs in the statement. No, I, you know, maybe certain jurisdictions enter into those kinds of ongoing monitorings as a matter of consent decrees, but even those have a limit. But for the court to say, I'm in charge forever, or more particularly, my monitor, is something that I thought the Supreme Court had said was going beyond our authority. Your Honor, on this record, it's not established factually that these services are actually being made available in a way that is giving Mississippians with serious mental illnesses— And how would you do that except having another whole lawsuit? Your Honor, exactly through the monitoring provisions in here, where it has the state to report how many people are receiving these services monthly, and if there is some outlier in a particular region, the court will be able to look and see. All right, well, you're talking about a model of Article III governance that Congress made every attempt to limit with the, was it the Prison Litigation Reform Act, which said that there has to be an end point to injunctive decrees like this. And again, Your Honor, respectfully, it's the United States' position that this, you know, the court was very attuned to the federalism cost involved in any kind of federal court supervision of a state system, and it said, state, you have proposed these services, and in fact, these are the services that the federal government pays 85 percent of the cost that are necessary to come into compliance with Title II of the ADA, and on this record of systemic and sustained noncompliance, this is the minimum that's needed for statutory compliance. Okay, and then just to wind this up, though, what other state is subjected to an ongoing decree and a court-appointed monitor? Your Honor, if I could, just so that I give the most accurate answer, I would be glad to answer that in the 28-J letter. But you don't know of any right now. Well, I know that the United States has brought similar suits against Georgia and Virginia. There's ongoing litigation in Florida. There's a monitor and a decree that's concluded in the state of Delaware successfully where the state expanded mental health services, so it's not indefinite. This isn't unique to Mississippi. It's the litigation the United States has brought, and just if I could, Your Honor, I just also want to make clear that the United States enforcement of Title II is not just limited to the Olmstead context that we see here. It's the same, you know, provisions that the United States would sue to make sure that, you know, a school has handicapped ramps, that polling places are accessible to individuals with disabilities. Why does the U.S. choose Title II over the Rehabilitation Act? In the Olmstead context, I think it's because this Olmstead decision was brought under Title II, but this Court's decisions and the uniform decisions of other courts of appeal hold that both the statutory language and the integration mandates under both statutes are the same. You don't have to prove that the entity receives federal funding, but the substantive obligations are identical. Okay. Thank you, Your Honor. Mr. Stewart. Thank you, Your Honor. I'd like to do my best to hit three key topics. First of all, the at-risk theory is absolutely central to the judgment below. The United States has owned it. It can't run away from it now. It invoked the at-risk theory more than a dozen times in its complaint. Its claim is about cycling, which means people are out of institutions but possibly end up back in there. Eighty percent of their 154-person sample when they were interviewed were not in institutions. 3904 to 3907 of the record of the ROA, Judge Reeves' opinion, the District Court recognized and adopted the at-risk theory. It realized that it needed that theory to rule against the state on a system-wide basis. The United States sought and was granted prospective injunctive relief. So past institutionalization, I think you might have been alluding to this, Judge Jones, is not enough for the sweeping prospective relief they sought, especially system-wide in a situation where there has been evolution and improvement of the system. Counsel, I know you have a lot to cover. Let me ask you about what Judge Jones was discussing with your friend on the other side a moment ago. I just looked at Judge Reeves' final orders. I don't see it. Did he ever make a ruling on whether what you represented had occurred since his earlier order had addressed all of what he said were the deficiencies, or is that your representation that he never said one way or the other? The response here was, yeah, you're good on paper in Mississippi, but you've proven that's not enough. I'm not being disrespectful to either of you by that, but I do think that is the situation. Do you know what was done with that, and what do you make of what, at least in the briefing, makes me concerned that perhaps you had fully complied before Carlton Reeves entered this final order? Sure, Your Honor. So I think what the district court kind of suggested, the special master, the idea was that basically I think their view was, look, Mississippi has on paper had these things for a long time. There needs to be some measure of verification ongoing. He didn't really, I think, fault us or say like, hey, your representations aren't true, but we have to see how they're playing out on the ground. Our position has been even if you reject all of our other thresholds, other arguments, our fundamental alteration defense, we have met the objective criteria that the United States presented at trial, so whatever could be required here, we've met it, and just sort of five-specking individual delivery of services is not what Olmstead was about. That's footnote 14. The court disclaimed adopting a standard of care, a particular level of services. On Olmstead, Your Honor, if I could just, one thing on Crip, I'll just point to a couple things. The district court ruled on it, did not treat it as waived. Our answer at ROA 82 and 83 preserved our various arguments, and the United States at ROA 58, paragraph 50 basically pleaded its way out of saying that there were egregious and flagrant conditions. Last and in closing, I do want to emphasize just some features of Olmstead. Olmstead was a very narrow case. It was a two-plaintiff case. Both were institutionalized. You had treating physicians, state treating physicians who said they should be released. The two plaintiffs didn't object, and still the court was very careful. It couldn't even get to five on the fundamental alteration part of the opinion. Justice Kennedy was too concerned about the federalism implications for a two-plaintiff case. This is an entire system-wide case, an upending of our system, where you have no individual plaintiffs, no state treating physicians. The United States just skipped over, and Judge Reeves, unfortunately, allowed them to skip over the presumptive state physician treating requirement, even though that was drawn from the statute. This is pages 601 to 602 of Olmstead. I'd also emphasize just footnote six of Olmstead. Notably, the court rejected both plaintiffs there. They had been institutionalized previously, but by the time the Supreme Court ruled, they were released. But the case was not moot because it was capable of repetition. They could be back again. So the ground for it, if I could just close with this one, Judge Jones. The court said this case is not moot because of capable repetition possibility. They could end up back in institutions. If the serious risk theory were a viable theory, the court could have just said there's an ongoing Title II violation. It wouldn't have needed to point to an exception to mootness. So I would just say and wrap up in 15 seconds. Before you wrap up, do you want to respond to the U.S. cause of action issue, or are you not inclined to? I mean, I think it's, you know, what I'd say, Your Honor, is just I would emphasize the any person. And, you know, the U.S. may say, you know, it's not any person, but that's who Title II is. Okay, but I take the main argument from the United States to be that even if you have a reasonable argument on text, we have precedents on the books that make clear that in other settings U.S. causes of action have been read into the law. And it would be weird to not follow that law under Title II, especially when Title II expressly refers to these other statutory regimes. Do you have a response to that? I do, Your Honor. So the response is simply the court has not reached the actual does Title II authorize. It kind of would have to assume the conclusion. Does Title II permit the U.S. to sue at all? And I think— I get that the Title II question is open, but if Title II is premised on remedies available elsewhere, and we found elsewhere that U.S. can sue, aren't we bound by precedent? Sorry about the Rehabilitation Act, right? I think in Title VI, Your Honor, I mean, again, I think it depends on whether— this is not a suit under Title VI. It's not a suit under the Rehabilitation Act. And the question is what does Title II do with those? And I think it is an open question in this circuit whether Title II doesn't— Isn't there an express reference—and I'm sorry to go over time, but isn't there an express reference under Title II to remedies available in these other statutes? It says—but the key point there, Your Honor, is Title II provides, quote, remedies, procedures, and rights, end quote, only to, quote, any person alleging discrimination. And our key point is— Okay, so there's still a fatal flaw. Right. But were it otherwise, Judge Ho— What about those other statutes? And pardon, I should look this up myself, but is that language in those other statutes any person aggrieved? You see my concern is even if you're right on text, I don't want to create a sort of weird, crazy cool precedent. Well, there's certainly no problem. This Court certainly is not bound. I mean, if it were bound, the Florida case I think would have been a lot easier. They would have just said, like, oh, hey, you know, it's well established that Title VI allows this. And therefore— Well, they went on bonk. I don't know what the 11th Circuit precedents are. Anyway, it doesn't matter. Right. But I think it does come back to any person, and that gives ample ground to just emphasize that this really is an open issue in this Court, Your Honor. Let me—I meant to ask—I meant to be more specific to Ms. Baldwin, but I'll ask you instead. Horn v. Flores, the Supreme Court, as I wrote in my notes here, if a remedy is implemented, continued enforcement of the court's order is improper. Correct, Your Honor. I assume the state cited that somewhere. That's probably where I'm— I think we have Horn in at least one of our briefs, you know, I believe. I think Frew is another one. Rizzo is another—kind of in the same kind of invasion of state authority kind of thing. But that's right, Your Honor. We met all of the things that were objectively shown that could arguably be needed to be met, and that is enough. Any other questions? No. Okay. Thank you. Thank you, Your Honor. Thank you.